

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEON BRAZIN, Individually And On Behalf Of All Others Similarly Situated, | Case Number: 10-CIV-8988 |
| Plaintiff, | AMENDED SHAREHOLDER CLASS ACTION COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES AND INDIVIDUAL CLAIMS FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 |
| v. | |
| J CREW GROUP, INC., MILLARD S. DREXLER, JOSH S. WESTON, JAMES G. COULTER, STUART M. SLOAN, HEATHER M. REISMAN, MARY ANN CASATI, DAVID C. HOUSE, STEPHEN J. SQUERI, STEVEN D. GRAND-JEAN, CHINOS HOLDINGS, INC. CHINOS ACQUISITION CORP., TPG CAPITAL and LEONARD GREEN & PARTNERS, L.P., | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Leon Brazen ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

## SUMMARY OF THE ACTION

1.      This is an individual action with respect to Counts I and II and a shareholder class action with respect to Counts III and IV brought by Plaintiff on behalf of holders of the public stock of J Crew Group, Inc. ("J Crew" or the "Company") against certain officers and/or directors of J Crew, and other persons and entities (collectively, the "Defendants") involved in a proposed transaction through which the publicly owned shares of J Crew common stock will be purchased by TPG Capital ("TPG") and Leonard Green & Partners, L.P. ("Leonard Green"), as detailed herein (the "Proposed Transaction").

2.     On November 23, 2010, J Crew announced that it had reached a definitive agreement and plan of merger whereby TPG and Leonard Green would acquire all outstanding shares of J Crew for $43.50 per share in cash (the "Merger Agreement"). J Crew estimated the total equity value of the Proposed Transaction to be approximately $3 billion.

3.     While the deal was touted as a 16% premium to the closing price of J Crew's stock on the last day before the deal was announced, it was deliberately timed to take advantage of a recent decrease in J Crew's trading value, thereby benefitting the Defendants and locking in an inadequate and unfair offer price for J Crew public shareholders. Indeed, the offer price is approximately 15% below J Crew's 52-week high, the Company is poised for significant expansion and future growth, and the intrinsic value of J Crew's common stock is materially in excess of the consideration offered. Moreover, the premium touted by the Defendants is deceiving because the Proposed Transaction comes on the heels of the Company's recent announcement of weak financials that were a result of cuts in the financial forecasts and prepayment of one of J Crew's loans. Despite this recent downturn, the Company has been resilient in an otherwise bad economy, growing its revenues leading to market share gains with great future profitability. Notably, the stock soared 20% upon news of a potential deal and is currently trading above the offer price – evidence in and of itself that the market values J Crew much higher than the Defendants. In fact, some analysts have placed the true value at close to $50 per share.

4.     In addition to the inadequacy of the consideration offered to J Crew's shareholders, the Proposed Transaction is rife with conflicts. TPG, a former owner of J Crew, is no stranger to cashing in on its investment in the Company. In 1997, TPG took J Crew private and after a subsequent public offering, made seven times its original investment. Now TPG

2

wishes to cash in on its investment *again* – benefitted with representation on J Crew's Board of Directors (the "Board") by TPG's founder, James Coulter ("Coulter") – by timing the Proposed Transaction to take advantage of a recent downturn in the Company's share price which is not reflective of J Crew's true value. Moreover, TPG and Leonard Green were advised by Goldman Sachs Bank USA ("Goldman"), who are, along with Bank of America Merrill Lynch ("Bank of America"), also providing the financing for the Proposed Transaction. Goldman was previously a significant creditor of J Crew, having extended a $285 million line of credit to the Company pursuant to a 2006 agreement.

5.     J Crew's management – the driving force behind the Proposed Transaction – also suffers disabling conflicts in that they stand to gain ample benefits from the Proposed Transaction. In particular, Millard S. Drexler ("Drexler"), the Company's CEO and Chairman currently holds an 11.8% stake in the Company owning more than 7.5 million shares, including more than 4 million shares tied to stock options. If the Proposed Transaction is consummated, Drexler will cash out his stock options and will receive 40% of the Company's new Class A common stock. Drexler is also the real trump card assuring the consummation of the Proposed Transaction. He is known as the "prince of retail" and is inextricably tied to the Company. Under the terms of the Merger Agreement he will continue as Chairman and CEO of J Crew with his annual compensation at nearly $6 million (including valued stock options) and an employment agreement that extends four years from the close of the Proposed Transaction. The disparity of the benefits to Drexler in the Proposed Transaction compared to J Crew's shareholders comes as no surprise, however. Just as TPG has a history of "cashing in" on J Crew, so too has defendant Drexler. Indeed, Drexler made nearly $320 million the first time TPG took the Company public.

6.     In addition to defendants Drexler and Coulter, four other current members of the Board suffer from conflicts of interest based on the fact that they were nominated to the Board by Drexler and TPG.  In fact, two of the directors appointed by Drexler and TPG sit on the Special Committee specifically created to evaluate the Proposed Transaction, including its Chairman.  Such conflicts prevent these directors from objectively considering the Proposed Transaction.

7.     In pursuing the unlawful plan to facilitate the acquisition of J Crew by TPG and Leonard Green for grossly inadequate consideration, through a flawed process, each of the Defendants violated applicable state law by directly breaching and/or aiding the other Defendants' breaches of their fiduciary duties of loyalty, due care, independence, good faith and fair dealing.

8.     Similarly, in an attempt to induce shareholder approval of the unfair Proposed Transaction, the Defendants caused to be filed with the Securities and Exchange Commission (the "SEC") the Schedule 14A Preliminary Proxy Statement (the "Proxy") on December 6, 2010, which contains incomplete and misleading disclosures.  Among other things, the Proxy misstates and/or fails to disclose material information concerning:  (a) the reasons why Drexler waited seven weeks to inform the Board about his ongoing discussions with TPG and Leonard Green in connection with a potential buyout of J Crew; (b) the criteria used to select and retain a financial advisor to the Board for the Proposed Transaction; and (c) the reasons why Drexler refused to work for any buyer other than TPG and why Drexler later changed his mind and notified the Special Committee that he would be willing to work for an acquiror other than TPG.  The material misstatements and omissions contained in the Proxy constitute violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

4

9.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin the Defendants from taking any steps to consummate the Proposed Transaction or, in the event the buyout is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties of loyalty, good faith, and due care.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C §1331 in that Plaintiff's claims arise in part under the Constitution and laws of the United States, including the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

11.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§1332(a), (c) and (d) as Plaintiff and the Defendants are citizens of and domiciled in different states and the amount in controversy exceed $75,000, exclusive of interests and costs.  Given that the Proposed Transaction is valued at nearly $3 billion, the relief sought herein will exceed a sum or value of $75,000. This action is not a collusive one to confer jurisdiction on this Court.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the Defendants either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint, including the Individual Defendants' primary participation in the wrongful acts detailed herein, aiding and abetting, and conspiracy in violation of fiduciary duties owed to J Crew, occurred in substantial part in this District.  Finally, the Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

13.    In connection with the acts, conduct and other wrongs alleged herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

## THE PARTIES

14.    Plaintiff is and has been at all relevant times a stockholder of J Crew and a citizen of the state of Florida.

15.    Defendant J Crew is a corporation organized and existing under the laws of Delaware, with its principal executive offices located at 770 Broadway, New York, New York 10003.  J Crew is a nationally recognized retailer of women's, men's and children's apparel, shoes and accessories.  The Company operates 250 retail stores, the J.Crew catalog business, jcrew.com, madewell.com and 85 factory outlet stores.

16.    Defendant Drexler has been J Crew's CEO, Chairman of the Board and a director since 2006.  Before joining J Crew, Drexler was Chief Executive Officer of The Gap, Inc. from 1995 until 2002, and was President of The Gap, Inc. from 1987 to 1995.  Drexler also serves on the Board of Directors and the Compensation and Nominating and Corporate Governance Committees of Apple, Inc.  Drexler is a resident of the state of New York.

17.    Defendant Josh S. Weston ("Weston") has served as a director of J Crew since 1998.  Weston was named as the Chairman of the Special Committee formed on October 14, 2010 to evaluate and negotiate the Proposed Transaction.  Weston was also nominated to the Board by Drexler and TPG pursuant to previous stockholders' agreements between Drexler and TPG ("Drexler-TPG Agreements").  Weston served as Honorary Chairman of the Board of Directors of Automatic Data Processing, a computing services business, from 1998 to 2004. Weston was Chairman of the Board of Directors of Automatic Data Processing from 1996 until 1998, and Chairman and Chief Executive Officer for more than five years prior thereto.  Weston

6

also serves on the Board of Directors and Compensation Committee of Gentiva Health Services, Inc. Weston is a resident of the state of New Jersey.

18.     Defendant Coulter has served as a director of J Crew since 1997.  Coulter is a founding partner of TPG, former owner of J Crew, and also serves on the Board of Directors of Lenovo Group Limited and The Neiman Marcus Group, Inc.  Coulter is a resident of the state of California.

19.     Defendant Stuart M. Sloan ("Sloan") has served as a director of J Crew since 2003.  Sloan was nominated to the Board by Drexler pursuant to the Drexler-TPG Agreements. Sloan is the founder of Sloan Capital Companies, a private investment company, and has been a principal thereof since 1984.  Sloan also serves on the Board of Directors and Compensation Committee of Anixter International, Inc.  Sloan is a resident of the state of Washington.

20.     Defendant Heather M. Reisman ("Reisman") has served as a director of J Crew since May 2007.  Reisman has recused herself from discussions regarding a potential sale of the Company because she is a board member of Onex Partners, a private equity firm founded by her husband, which might be interested in participating with TPG in a transaction involving the sale of the Company.  Reisman is the founder of Indigo Books & Music, Inc., a Canadian book and music retailer, and has served as its Chief Executive Officer since 1996.  Reisman is a citizen of Canada.

21.     Defendant Mary Ann Casati ("Casati") has served as a director of J Crew since 2006. Casati is a member of the Special Committed formed on October 14, 2010 to evaluate and negotiate the Proposed Transaction.  Casati was nominated to the Board by Drexler and TPG pursuant to the Drexler-TPG Agreements.  Casati is also a founding partner of Circle Financial Group LLC, a private wealth management membership practice, and has served as such since

2003. Prior to that, Casati was a partner and managing director of Goldman, Sachs & Co. where she was employed for twenty years. Casati is a resident of the state of New York.

22.     Defendant David C. House ("House") has served as a director of J Crew since July 2007. House is a member of the Special Committee formed on October 14, 2010 to evaluate and negotiate the Proposed Transaction. House is Chairman of Serenoa LLC, a family-owned investment business, and serves as an advisor to Pegasus Capital Advisors, L.P., a private equity firm. Prior to that, House was Group President of the Global Network and Establishment Services and Travelers Cheques and Prepaid Services businesses at American Express Company ("American Express"), a diversified global travel and financial services company, from 2000 until 2006 and served on its Global Leadership Team. He joined American Express in 1993 and held various senior positions there prior to assuming his global role as a Group President. House is a resident of the state of South Carolina.

23.     Defendant Stephen J. Squeri ("Squeri") has served as a director of J Crew since September 2010. Squeri is also a member of the Special Committed formed on October 14, 2010 to evaluate and negotiate the Proposed Transaction. Squeri is group president of global services and chief information officer at American Express since 2009, and worked with House at American Express. Squeri joined American Express in 1985 and has held various senior positions since then, including executive vice president and chief information officer from 2005 to 2009, president of the Global Commercial Card division from 2002 to 2005 and president of Establishment Services Canada and the United States from 2000 to 2001. Prior to joining American Express, Squeri was a management consultant at Arthur Andersen and Company from 1981 to 1985. Squeri is a resident of the state of New Jersey.

24.     Defendant Steven D. Grand-Jean ("Grand-Jean") has served as a director of J Crew since 2003. Grand-Jean was nominated to the Board by Drexler and TPG pursuant to the Drexler-TPG Agreements. Grand-Jean has been President of Grand-Jean Capital Management for more than five years. Grand-Jean Capital Management provides financial advisory and investment services to the Drexler family, including a family foundation established by Mr. Drexler, for which it is handsomely compensated. Grand-Jean is a resident of the state of California.

25.     Defendants Drexler, Weston, Coulter, Sloan, Rreisman, Casati, House, Squeri and Grand-Jean are collectively referred to hereinafter as the "Individual Defendants."

26.     Each of the Individual Defendants is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

27.     Defendant TPG is the global buyout group of TPG, a leading private investment firm founded in 1992, with more than $48 billion of assets under management and offices in San Francisco, Beijing, Fort Worth, Hong Kong, London, Luxembourg, Melbourne, Moscow, Mumbai, New York, Paris, Shanghai, Singapore and Tokyo. TPG has extensive experience with global public and private investments executed through leveraged buyouts, recapitalizations, growth investments, joint ventures and restructurings. TPG invests in world-class franchises across a range of industries, including past and present retail investments such as American Tire Distributors, Burger King, China Grand Auto, Daphne, Debenhams, Myer, Neiman Marcus Group, PETCO Animal Supplies and Republic, among others.

28.     Defendant Leonard Green is a Delaware corporation and a leading private equity firm with over $9 billion in equity capital under management. Based in Los Angeles, Leonard Green & Partners invests in market leading companies across a range of industries. Significant current retail investments include Whole Foods Market, Neiman Marcus Group, PETCO Animal Supplies, Leslie's Poolmart, The Sports Authority, The Container Store, Tourneau, David's Bridal, Jetro Cash & Carry and The Tire Rack.

29.     Defendants Chinos Holdings Inc. ("Parent") and Chinos Acquisition Corp. ("Merger Sub") are Delaware entities formed by TPG and Leonard Green to effectuate the merger.

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS UNDER STATE LAW

30.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other public shareholders of J Crew and owe Plaintiff and the other members of the Class (as defined herein) the duties of good faith, fair dealing, loyalty and full and candid disclosure.

31.     By virtue of their positions as directors and/or officers of J Crew, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause J Crew to engage in the practices complained of herein.

32.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive and to disclose all material information concerning the proposed change of control to

enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

      (a)      adversely affects the value provided to the Company's shareholders;

      (b)      contractually prohibits them from complying with or carrying out their fiduciary duties;

      (c)      discourages or inhibits alternative offers to purchase control of the corporation or its assets;

      (d)      will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

      (e)      will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

      33.      Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other public shareholders of J Crew, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the public shareholders of J Crew common stock.

### CLASS ACTION ALLEGATIONS

      34.      Plaintiff brings Counts III and IV individually and as a class action pursuant to Rule 23 on behalf of all holders of J Crew common stock who are being and will be harmed by the Defendants' actions described below (the "Class").  Excluded from the Class are the Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

11

35.     This action is properly maintainable as a class action because as of the Class is so numerous that joinder of all members is impracticable.  As of November 3, 2010, there were nearly 64 million shares of J Crew common stock issued and outstanding.  These shares are held by hundreds, if not thousands, of beneficial holders.

(a)     there are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member, including: whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(b)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(c)     whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated; and

(d)     whether TPG and Leonard Green are aiding and abetting the wrongful acts of the Individual Defendants.

36.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

37.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

38.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

39.     The Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

40.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### A.     Background

41.     J Crew debuted in 1983 with the mailing of its first catalog. Prior to that, the Company was doing business as Popular Club Plan, founded in 1947 by Mitchell Cinader and Saul Charles. The Company focused on the upper-middle-class customer and in 1989, expanded from catalogues to stores by opening its first store in New York City's South Street Seaport. Currently, the Company has retail and outlet stores nationwide and an ever-growing online and catalogue business.

42.     In 1997, TPG and J Crew completed a deal in which TPG took an 85% stake in the Company, with management retaining the remaining Company stake.   TPG planned to strengthen retail sales by adding stores and eventually taking the Company public, which it did in 2006, but not before hiring defendant Drexler in 2003.

43.     After the initial public offering in which TPG made seven times its original investment while it decreased its holdings from 85.2 percent to 39.2 percent, the Company introduced Madewell, a modern-day interpretation of an American denim label founded in 1937.

Targeting women ages 18 to 40, Madewell has a flagship store in New York City and 17 other stores nationwide. In the Summer 2010, the Company launched Madewell's much anticipated ecommerce site, madewell.com.

44.    J Crew has also introduced several line extensions, including crewcuts (for kids sizes 2–14), J Crew Weddings & Parties and J Crew Collection (featuring exclusive and limited-edition pieces with couture-level details).

45.    As of November 23, 2010, the Company operated 250 retail stores, including 221 J Crew retail stores, 9 crewcuts, 2 men's stores, 1 women's collection store and 20 Madewell stores, throughout the United States. The Company also operates 85 factory stores in the United States. J Crew continues its retail expansion with a series of new specialty boutiques. Two men's-only stores in downtown Manhattan—The Liquor Store and The Men's Shop—are filled with a curated selection of J Crew must-haves, limited-edition items, vintage finds and a suiting shop. No. 1035 is the exclusive Madison Avenue women's shop dedicated to the Collection label, plus one-of-a-kind products and vintage pieces.

**B.    J Crew Is Poised For Growth**

46.    By late 2009, the stock was rated a "Buy" by *The Street.com* as it was noted, "J Crew outmaneuvered competitors during the recession and took steps to improve its balance sheet, evident in its $147 million of net cash. The stock has climbed 30% during the past three months."

47.    As of December 14, 2009, J Crew stock was trading at $45.07 after announcement of the 3Q 2010 results and announcement that November 2009 retail sales increased 1.3%, twice as much as expected. 3Q 2009 profit more than doubled to $44 million, or 67 cents a share, as revenue increased 14% to $414 million. J Crew's gross margin widened from 45% to 48%, and

14

its operating margin doubled from 9% to 18%. The Company had $247 million of cash and $99 million of debt. Over a three-year period, J Crew had grown earnings per share 84% annually, on average.

48.     On March 9, 2010, J Crew announced its financial results for the fourth quarter and fiscal year ended January 30, 2010 (fiscal 2009) that boosted earnings per share to 61 cents, swinging back from a year-earlier loss of 22 cents. The Company beat analysts' earnings estimate of 46 cents per share. The press release gave some of the following fourth quarter highlights: Revenues increased 19% to $460.6 million, store sales increased 23% to $311.1 million, with comparable store sales increasing 17%, gross margin increased to 43.9% of revenues from 27.6% of revenues in the fourth quarter of fiscal 2008. The results also indicated that operating income increased to $68.6 million, or 14.9% of revenues, compared with an operating loss of $20.4 million, or 5.3% of revenues, in the fourth quarter of fiscal 2008.

49.     Defendant Drexler commented on the results: "We are extremely pleased with all we achieved in 2009. Our bar has been set high and it is our continued mission to be creative, to be innovative, and to emotionally connect with our customers."

50.     Fiscal 2009 highlights included: Revenues increased 11% to $1,578.0 million. Store sales increased 14% to $1,110.9 million, with comparable store sales increasing 4%; direct sales increased 5% to $428.2 million; gross margin increased to 44.1% of revenues from 38.9% of revenues in fiscal 2008 and operating income increased to $211.3 million, or 13.4% of revenues, compared to $96.7 million, or 6.8% of revenues, in fiscal 2008. Net income for fiscal 2009 was $123.4 million, or $1.91 per diluted share.

51.     On this same date, the International Council of Shopping Center's weekly retail snapshot reported that sales at chain stores increased steadily with a 2.9% gain week over week.

52.     On March 17, 2010, Jim Cramer told his audience on "Mad Money" that J Crew
is "a top-notch, best-of-breed retailer that is indeed firing on all cylinders." He based his call on
the Company's most recent quarter, which he said was a "fabulous blowout Cramer pointed to J
Crew's conference call in which defendant Drexler stressed that how consumer habits had
changed in the recession and how shoppers were prioritizing value.  Defendant Drexler also
noted in the conference call that J Crew keeps its products original and proprietary, creates
demands for its products, and keeps these demands at the top of customers' minds.  Cramer also
noted how defendant Drexler was launching new concepts for J Crew like Crew Cuts for kids
and Madewell for women and the plans for a men's store and a wedding-themed outlet.  Cramer
also liked something he called J Crew's "congratulations quotient."  That's the number of kudos
given during a conference call, and he sees it as an indication of just how strong the quarter was.
J Crew got pats on the back from 10 of 16 analysts who asked questions, a five-to-eight ratio –
"one of the highest I have ever seen," Cramer said.

53.     Given the positive results for the Company, it was reported on Form 8-K with the
U.S. Securities and Exchange Commission on April 16, 2010 that the Compensation Committee
of the Board would make discretionary cash payments to certain senior officers of the Company,
whose participation in the Company's fiscal year 2009 annual cash incentive plan had been
suspended at the beginning of the fiscal year in light of the then challenging economic
conditions.

> Given the Company's substantial outperformance relative to goals during fiscal
> 2009, the Committee determined these payments were appropriate in recognition
> of both individual and Company performance. The amount awarded to each of the
> Named Executive Officers is as follows: Mr. Drexler - $2,000,000; Mr. Scully -
> $250,000; Ms. Gardner - $425,000; Ms. Lyons - $325,000; and Ms. Wadle -
> $200,000.

16

In addition, the Committee named Jenna Lyons as Executive Creative Director, effective immediately. In this role, Ms. Lyons will continue to be eligible to participate in the Company's executive compensation programs at the same levels that applied to her as Creative Director.

54.     On May 27, 2010, J Crew said its fiscal first-quarter profit jumped to $44.7 million, or 68 cents a share, from $20.4 million, or 32 cents a share, in the year-prior period. Analysts polled by FactSet Research were looking for a profit of 56 cents a share, on average. Revenue for the period rose to $413.9 million from $345.8 million. For the full year, the Company raised its profit outlook to a range of $2.35 to $2.45 a share, from a prior range of $2.20 to $2.30 a share. Analysts expect earnings of $2.35 a share, on average. For the second quarter, J Crew announced it expected earnings of 40 cents to 45 cents a share, versus a consensus of 44 cents a share. Shares of J Crew rose about 2% in after-market trading to $44.51.

55.     J Crew announced on July 13, 2010 that its President - Retail and Direct, Tracy Gardner, resigned and will leave the Company effective September 13, 2010. Ms. Gardner's resignation was not as a result of any disagreement with the Company or its management. In connection with the organizational changes, including Ms. Lyons being promoted to President & Executive Creative Director, the Compensation Committee of the Board approved base salary increases for Ms. Lyons, Mr. Scully and Ms. Wadle on July 12, 2010 as follows: Ms. Lyons - $1,000,000; Mr. Scully - $700,000; and Ms. Wadle - $600,000. In addition, Ms. Wadle's target annual cash incentive will increase to 75% of base salary.

56.     On August 26, 2010, J Crew announced financial results for the three months (second quarter) and six months (first six months) ended July 31, 2010. Highlights included: Revenues increased 14% to $407.5 million, store sales increased 14% to $295.0 million, with comparable store sales increasing 11%, direct sales (Internet and Phone) increased 16% to $102.5 million, gross margin increased to 44.6% of revenues from 41.2% of revenues in the

second quarter of fiscal 2009 and operating income increased 83% to $59.0 million, or 14.5% of revenues, compared to $32.2 million, or 9.0% of revenues, in the second quarter of fiscal 2009. Net income was $34.9 million, or $0.53 per diluted share, compared to net income of $18.6 million, or $0.29 per diluted share, in the second quarter of fiscal 2009.

57.     Defendant Drexler commented on the Second Quarter Fiscal 2010 Results: "While we are really pleased with the second quarter, it is more critical than ever to continue to move forward and invest in our business for quality, long term, earnings growth. It's about moving, doing, creating - it never stops."

58.     The growth was not anticipated to end.  For example, Robert W. Baird analyst Erika Maschmeyer said: "We see potential for 300 J.Crew retail and 100 factory stores in the U.S., plus potential for 10-15 stores in Canada, 35 Crewcuts sites, and Madewell expansion. After growing units at a 13.9 percent CAGR from 2005-2008, JCG deliberately slowed growth to 7.0 percent in 2009 and plans unit expansion of 4.4 percent in 2010. Management plans to reaccelerate store growth in 2011 (mid-single-digit square-footage growth, excluding Madewell)."

59.     However, the Company's third-quarter profit fell to $37.8 million, or 58 cents a share, from $43.9 million, or 67 cents a share, a year earlier. On November 23, 2010, J Crew announced that while sales rose 4% to $429.3 million, comparable store sales decreased 1%. Accordingly, J Crew cut its full-year profit forecast to $2.08 to $2.13 a share from a previous guidance of profit of as much as $2.35 a share.

60.     The Defendants pounced at this one-time shortfall to do a deal when the stock was temporarily weakened and announced the Proposed Transaction.

C.    **The Proposed Transaction**

61.    The same day that it announced it was cutting its forecast for the year,  J Crew

issued the following press release on November 23, 2010 announcing that the Individual

Defendants had agreed to sell J Crew to TPG and Leonard Green in a cash transaction for $43.50

per share:

> **TPG Capital and Leonard Green & Partners to Acquire J.Crew Group, Inc. for $43.50 Per Share in Cash**
>
> **Millard Drexler Will Remain as Chairman and CEO and Significant Shareholder Transaction Valued at $3.0 Billion**
>
> NEW YORK, Nov. 23, 2010 /PRNewswire-FirstCall/ -- J.Crew Group, Inc. (NYSE: JCG) today announced that it has entered into a definitive agreement to be acquired by funds affiliated with TPG Capital and Leonard Green & Partners, L.P. Millard Drexler will continue as Chairman and CEO and maintain a significant equity investment in J.Crew.
>
> Under the terms of the agreement, holders of the outstanding common shares of J.Crew will receive $43.50 per share in cash, or a total of approximately $3.0 billion. The price represents a premium of 29% to J.Crew's average closing share price over the last month.
>
> A Special Committee of the J.Crew Board of Directors, comprised of four independent directors, and advised by independent financial and legal advisors, negotiated the transaction and recommended it to the full Board. The agreement was approved by the full Board other than James Coulter, a partner of TPG Capital, and Millard Drexler, who recused themselves from the vote.
>
> Millard Drexler, J.Crew Chairman and CEO, said, "I am pleased to announce this agreement as it delivers significant value to our shareholders. In addition, it is a clear endorsement of J.Crew and of the hard work and commitment of each and every one of our associates. As I have always said, we are in this for the long term and we do what we do day in and day out so we can deliver the best possible products to our customers. TPG Capital, with whom we have a long working relationship, along with Leonard Green & Partners, are both well respected private investment firms whose substantial resources and experience will enable us to invest in our future growth. I am excited to be partnering with TPG Capital and Leonard Green & Partners on this transaction and that our management team, including our President Jenna Lyons, will continue to work towards our future."
>
> Carrie Wheeler, Partner of TPG Capital, stated: "We are proud of our 13-year history with J.Crew since our investment in the company in 1997 and the success it has achieved

during our partnership with Mickey. With his leadership, combined with the support of TPG Capital and Leonard Green & Partners, the Company will be well positioned for the long term. We are looking forward to working with Mickey and his exceptional team and are excited by the prospect of continuing to expand the business."

Jonathan Sokoloff, Managing Partner of Leonard Green & Partners, said: "J.Crew occupies a distinctive space in fashion retail and we are very pleased to partner with Mickey and TPG Capital for the next chapter of the Company's growth. J.Crew's strong brand equity and proven multichannel strategy position the Company extremely well to expand its business, both in the U.S. and internationally."

Josh Weston, Chairman of the Special Committee of the J.Crew Board of Directors, stated: "After a thorough assessment, based on independent financial and legal advice, we concluded this transaction will maximize value for shareholders. We are also pleased to have successfully negotiated for J.Crew's public shareholders a robust 'go-shop' provision that extends beyond the holiday season."

The investor group has secured committed financing from Bank of America Merrill Lynch and Goldman Sachs Bank USA.

The agreement permits the Special Committee to solicit, receive, evaluate and enter into negotiations with respect to alternative proposals through January 15, 2011. The Special Committee, with the assistance of its independent advisors, will actively solicit alternative proposals during this period. There can be no assurance that this process will result in a superior offer. If there is no superior offer, the transaction is expected to close in the first half of fiscal 2011, subject to customary approvals and closing conditions. Completion of the transaction also requires approval by a majority of the outstanding J.Crew shares. J.Crew and the Special Committee do not intend to disclose developments with respect to the solicitation process unless and until the Special Committee and the Board have made a decision.

The Special Committee was advised by an independent financial advisor, Perella Weinberg Partners LP, and an independent legal advisor, Cravath, Swaine & Moore LLP. Cleary Gottlieb Steen & Hamilton LLP is acting as legal advisor to J.Crew. Goldman, Sachs & Co. and Bank of America Merrill Lynch are acting as financial advisors to TPG Capital and Leonard Green & Partners. Ropes & Gray LLP is acting as legal advisor to TPG Capital and Latham & Watkins is acting as legal advisor to Leonard Green & Partners.

## D.    The Flawed Process

62.    The flawed process leading up to the Proposed Transaction was orchestrated by defendant Drexler during the fall of 2010. According to the Proxy, TPG arranged for an introductory meeting on August 23, 2010 between representatives of Leonard Green and Drexler.

At that meeting, Drexler began discussions regarding a "potential leveraged buyout of the Company."

63.     Subsequently, during the course of September 2010, Drexler and members of J Crew's management met repeatedly with representatives of TPG and provided them with certain non-public information about the Company, including management's then current estimates for third quarter results and management's then current outlook for the fourth quarter and full year performance. At this point in the discussions, however, there was no confidentiality agreement in place between the Company and TPG.

64.     It was not until October 7, 2010, *seven weeks after TPG first expressed interest in a potential leveraged buyout*, that Drexler finally contacted the Board to inform them of TPG's interest in a transaction involving the sale of the Company. On October 15, 2010, the Board formed the Special Committee consisting of defendants Casati, House, Squeri, and Weston, with defendant Weston as Chairman.

65.     On October 15, 2010, Drexler received a call from a representative of a private equity fund, referred to as "Party B" expressing interest in acquiring the Company, perhaps in conjunction with TPG. At no time did Party B and TPG work together in connection with a proposed transaction involving the Company.

66.     On October 20, 2010, the Special Committee selected the law firm Cravath, Swaine & Moore LLP ("Cravath") to act as its legal advisor with respect to any potential transaction. Immediately upon being retained, Cravath sent an email to TPG freezing "the process in place" while the Special Committee got "up to speed" on the nature of the deal. Cravath also arranged for the Delaware law firm of Richards, Layton & Finger to get involved on fiduciary duty issues. In a December 10, 2010 *New York Times* article titled "J Crew Buyout

21

Raises Questions," Steven Davidoff noticed that "Cravath realized that the buyout process was out of control" and that "Cravath did not like the process and was in damage-control mode."

67.     In an October 29, 2010 Special Committee meeting, Drexler informed the Special Committee that "he had significant reservations about the prospect of working for a new boss, but that he had a high comfort level with TPG and had a positive experience with them during the period in which TPG owned the Company." The Special Committee concluded that, based on Drexler's comments, "Drexler would be unwilling to work for any third party other than TPG."

68.     During the week of November 8, 2010, Drexler again received an email from Party B expressing further interest in discussing an acquisition of the Company. Perella Weinberg Partners ("Perella Weinberg"), financial advisor to the Special Committee assessing the Proposed Transaction, later scheduled a meeting with Party B for November 16, 2010, during which Party B indicated, among other things, that it would only be interested in a potential transaction if Drexler was willing to remain with the Company following an acquisition of the Company by Party B, which the Special Committee believed Drexler was unwilling to do.

69.     However, despite Party B's continued interest, the Special Committee and TPG agreed on a buyout price of $45.50 per share, subject to confirmatory due diligence, on November 14, 2010.   Following these discussions, TPG and Leonard Green executed a confidentiality agreement with the Company on November 16, 2010. TPG and Leonard Green subsequently lowered their offer to $43.00 per share, and the Individual Defendants eventually accepted the revised offer of $43.50 on November 23, 2010.

70.     In the Master Q&A attached to J Crew's Form 8-K filed with the SEC on November 23, 2010, Question 14 asks, "Did the Board shop the company to see if a better deal

was available?" Without directly stating "No" (the true answer), the Company states the Special Committee of the Board concluded the transaction is the best way to maximize shareholder value for shareholders and that there is a "go shop" period through January 15, 2011 in which the Special Committee may solicit superior proposals – thereby revealing that the Company had never shopped the Company. Indeed, the Individual Defendants were not seeking other potential acquirors because the Board, led by TPG, defendants Coulter and Drexler, were set on "locking up" a potential buyout of J Crew in favor of TPG, evidenced by Drexler's initial refusal to work for any third party other than TPG. Even after Drexler later changed his mind, and notified the Special Committee on November 22, 2010 that he would be open to continuing his employment with the Company following a sale to an acquirer other than TPG, the Individual Defendants never re-contacted Party B, but rather, eventually accepted the Proposed Transaction.

71.    The Individual Defendants rushed to capitalize on the temporary weakened financials of J Crew and commence a deal most favorable to themselves, as opposed to J Crew shareholders that would allow them to continue on with the lucrative employment agreements and benefits packages with the successor entity.

72.    The purported go-shop period is a thinly veiled cloak on a deal that is really a *fait accompli*. The period itself, up until January 15, 2010, is too short a period to generate genuine interest. When factoring in the holidays that fall within that period as well, it would be a near impossibility for a potential buyer to do the necessary due diligence and negotiate with the Board. Moreover, because Drexler and Coulter are parties to the Proposed Transaction, with their personal appointees populating the Board, any potential bid from a third party would be a waste of time. Indeed, management's significant financial interest in the Proposed Transaction, particularly Drexler, raise serious doubt as to whether management and the Board would be

prepared to be forthcoming with the necessary due diligence required to complete a competing bid.

73.     The process leading up to approval of the Merger Agreement is further tainted by the fact that Perella Weinberg, has earned significant fees from prior engagements with TPG, including the $6.4 billion dollar acquisition by TPG of a majority stake in Telediffsion de Franceradio, TV and telecom operators in 2006, thereby calling into question their ability to fairly and independently advise the Special Committee.

E.     **The Inadequate Offer Price**

74.     As discussed herein, the $43.50 per share consideration offered in the Proposed Transaction is also unfair and grossly inadequate because, among other things, the intrinsic value of J Crew's common stock is materially in excess of the amount offered given the Company's prospects for future growth and earnings.  The market's reaction to the news of the Proposed Transaction demonstrates the strength of J Crew's outlook and the inadequacy of the consideration offered.  Upon the news of a potential deal with TPG and Leonard Green, J Crew shares surged 20% on November 23, 2010.  Since that time, J Crew stock has *consistently* closed above the price offered in the Proposed Transaction.  Indeed, one analyst as noted by *Bloomberg* believes the stock is worth $50 per share.

75.     The Proposed Transaction represents a paltry premium of just 16% based on the closing price of J Crew stock the last trading day prior to the announcement of the Proposed Transaction.  Noting on premiums paid in M&A, on December 21, 2009, a *Bloomberg* article entitled "CEOs paying 56% M&A Premium Shows Stocks May be Cheap" reported that "[t]he average premium in mergers and acquisitions in [2009] which U.S. companies were the buyer and seller rose to 56% this year from 47 percent last year [2008]...."  Thus, the Proposed

Transaction premium of 16% is well below the average premium in similar transactions. Additionally, the premium here is based the recent artificial and temporarily lower trading price for J Crew stock and the unexpected prepayment of one of its loans to a bank involved in the Proposed Transaction. The offer is also significantly below the Company's 52-week high.

76.     As noted in *Seeking Alpha*, on November 30, 2010,

During the recent economic downturn when many of its peers were badly hit, J. Crew was able to grow revenues by focusing on basic styles rather than fashion-forward items leading to market share gains. This strategy is continuing to pay off.

In addition to this, J.Crew has been working on improving its sourcing and distribution processes, which has helped to reduce costs and improve gross margin by nearly 6 percentage points during fiscal year 2009. For the first three quarters of fiscal 2010, its gross margins were up by nearly 1.5 percentage points vs. the same period last year.

                                    ***

J. Crew's strong brand value, multi-channel operations and improving margins position the company extremely well to expand its business. With retail spending picking up in the US, J.Crew expects strong sales during the holiday season.

Revenue per square foot, a common retail sales metric we track, increased from around $460 in 2005 to $530 in 2009. We expect it to approach towards the $700 mark by the end of our forecast period. If we upped the revenues per square foot to $750, this adds about 3% to our price estimate.

77.     It is clear that the Proposed Transaction does not reflect the full value of the Company. Instead of maximizing shareholder value as the Individual Defendants are duty-bound to do, they put themselves first and J Crew's public shareholders will be denied their right to share proportionately in the true value of the Company's future profits and growth prospects at a time when the Company is poised to increase its profitability.

**F.    Management Incentives Under The Merger Agreement**

78.    Unlike the paltry consideration to be paid to shareholders in the Proposed Transaction, certain of the Individual Defendants stand to fare much better if the Proposed Transaction is consummated.   Under the terms of the Merger Agreement, Drexler is receiving $300 million in cash in the buyout and is investing over $100 million into the equity of the private company.   The net result is that Drexler will be paid $200 million in cash and receive an 8.8 percent stake in the new company.   Moreover, he will continue as Chairman and CEO of J Crew with annual compensation at nearly $6 million (including valued stock options, at his current rate) and his employment agreement stretches 4 years from the close of the Proposed Transaction.

79.    Additionally, the terms of the Merger Agreement state that Drexler will receive 40% of the new Company's Class A common stock to set aside as an "incentive for J Crew management."

80.    Accordingly, J Crew's management is highly incentivized to support the Proposed Transaction based on awards of equity based compensation and continuity of employment that the CEO will receive as a result of the Proposed Transaction.

**G.    The Termination Fee**

81.    The Merger Agreement includes an effective $54 million termination fee and should the Company receive a better offer during the go-shop period, J Crew will still need to pay $27 million.

**H.    The Materially Misleading And/or Incomplete Proxy Statement**

82.    The Proxy fails to provide Plaintiff with material information and/or provides materially misleading information thereby rendering the shareholders unable to make an

informed decision on whether to vote their shares in support of the Proposed Transaction. Specifically, the Proxy omits/or misrepresents the material information set forth below in contravention to Sections 14(a) and 20(a) of the Exchange Act.

83.     First, as disclosed in the Proxy, Drexler began negotiations with TPG in August, 2010. The Proxy fails to disclose why Drexler waited seven weeks before informing the Board about his ongoing discussions with TPG and Leonard Green in connection with a potential buyout. In addition, as part of these ongoing discussions, Drexler and J Crew management provided confidential information regarding the Company, including estimates of current results and future financial projections for the remainder of 2010. The Proxy, however, fails to disclose why the Company provided this non-public information to TPG without a confidentiality agreement in place, which TPG did not sign until November 16, 2010.

84.     According to the Proxy, on October 21, 2010, the Special Committee interviewed two investment banks seeking to act as financial advisor to the Special Committee. The Special Committee then selected Perella Weinberg to act as its financial advisor. The Proxy fails to disclose the process which led to the selection of Perella Weinberg, the specific criteria used during the selection process, whether any other financial advisors were considered by the Special Committee during the selection process, and what procedures (if any) were put in place to avoid further potential conflicts.

85.     The Proxy also fails to describe in sufficient detail (i) why Drexler had significant reservations about the prospect of working for any potential buyer other than TPG, and (ii) why Drexler later changed his mind and notified the Special Committee that he would be willing to continue his employment at J Crew following a sale to an acquiror other than TPG. Additionally, the Proxy fails to disclose why Party B was never re-contacted after Drexler

asserted he would be willing to work with other parties, despite Party B's continued interest in a potential acquisition of J Crew.

86.     The Proxy fails to disclose the free cash flow projections that were prepared by J Crew management and provided to Perella Weinberg in preparing its fairness opinion, upon which the Board relied.

87.     In addition, the Proxy fails to disclose all of the underlying methodologies, projections, key inputs and multiples relied upon and observed by Perella Weinberg in connection with the Proposed Transaction, which are necessary for shareholders to evaluate and properly assess the credibility of the various analyses performed by Perella Weinberg and relied upon by the Board in recommending the Proposed Transaction. In particular, the Proxy is deficient and should provide, *inter alia,* the following:

    (a)    The identity of the "equity research analysts," their respective share price targets for J Crew, and the date range associated with the reports, observed by Perella Weinberg in its *Equity Research Analyst Stock Price Target Statistics* section;

    (b)    A description of the criteria and multiples observed by Perella Weinberg for each company in the *Selected Publicly Traded Companies Analysis* for J Crew;

    (c)    A description of the criteria and multiples observed by Perella Weinberg for each company in its *Selected Transactions Analysis* for J Crew, as well as the Price to Earnings multiples on these transactions;

    (d)    A description of how Perella Weinberg selected the 6.0 – 7.5x EBITDA multiple to calculate terminal values in the *Discounted Cash Flow Analysis*, as well as a description of how Perella Weinberg computed the discount rates ranging from 11% - 15%; and

    (e)    A description of the companies and premiums observed by Perella Weinberg for each company in its *Illustrative Premiums Paid Analysis.*

88.     Accordingly, because the foregoing material misstatements and omissions represent a violation of federal and state law, Plaintiff seeks injunctive and other equitable relief

to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

### FIRST CAUSE OF ACTION

#### On Behalf of Plaintiff for Violations of Section 14(a) of the Exchange Act (Against J Crew and the Individual Defendants)

89.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

90.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

91.     J Crew and the Individual Defendants have caused the Proxy to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

92.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

93.     Specifically, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, the Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render it non-misleading.

94.     The misrepresentations and omissions in the Proxy are material to Plaintiff  and Plaintiff will be deprived of his entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the date of the shareholder vote on the Proposed Transaction.

## SECOND CAUSE OF ACTION

### On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

95.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

96.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of J Crew within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of J Crew, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

98.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

30

100.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.    The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.    The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

101.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.    By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

### THIRD CAUSE OF ACTION

**On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties
Against the Individual Defendants**

102.    Plaintiff repeats and realleges each allegation set forth herein, except for Counts I and II.

103.    The Individual Defendants have violated their fiduciary duties of care, loyalty, candor and good faith owed to public shareholders of J Crew.

104.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in J Crew.

105.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith and independence

owed to the shareholders of J Crew because, among other reasons, they failed to take steps to maximize the value of J Crew to its public shareholders, by, among other things, failing to adequately consider potential bidders, instead favoring their own interests, or their fellow directors or executive officers' interests to secure all possible benefits with a friendly, known buyer that has a 13-year history with the Company as former owner, rather than protect the best interests of J Crew's shareholders. The flawed process provides an unfair advantage to Defendants TPG and Leonard Green by excluding other alternative proposals at an inadequate offer price.

106.    The Individual Defendants dominate and control the business and corporate affairs of J Crew and are in possession of private corporate information concerning J Crew's assets, business and future prospects. Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of J Crew which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

107.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

108.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of J Crew's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

109.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

110.    The Individual Defendants have engaged in self-dealing, have not acted in good faith to Plaintiff and the other members of the Class, and have breached, and are breaching, fiduciary requirements to the members of the Class.

111.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## FOURTH CAUSE OF ACTION

### On Behalf of Plaintiff and the Class Against J Crew, TPG, Leonard Green, Parent and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty

112.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    J Crew, TPG, Leonard Green, Parent and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to J Crew's public shareholders, and has participated in such breaches of fiduciary duties.

114.    J Crew, TPG, Leonard Green, Parent and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, J Crew, TPG, Leonard Green, Parent and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary

33

duties. Specifically, these Defendants offered valuable benefits to certain of the officers and directors of J Crew in order to entice them to enter into the Merger Agreement.

115. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants as follows:

A. Declaring that the Individual Defendants have violated the securities laws as set for individually in Counts I and II;

B. Declaring that this action is properly maintainable as a Class action with regards to the claims asserted in Counts III and IV and certifying Plaintiff as Class representative;

C. Enjoining the Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company makes full and complete disclosure of all materials facts necessary to enable shareholders to cast an informed vote on the Proposed Transaction;

D. Enjoining the Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a merger agreement providing the best possible terms for shareholders;

E. Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

F.   Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants' wrongdoing;

G.   Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.   Granting such other and further equitable relief as this Court may deem just and proper.

DATED:  December 28, 2010          **FARUQI & FARUQI, LLP**

By: _____
                                      Juan E. Monteverde (JM-8169)

                                  Nadeem Faruqi (NF-1184)
                                  Juan E. Monteverde(JM-8169)
                                  Jamie R. Mogil (JRM-9108)
                                  369 Lexington Avenue, 10th Floor
                                  New York, NY 10017
                                  Tel: 212-983-9330
                                  Fax: 212-983-9331

                                  *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, JoAnn M. Sorrento, hereby certify that on December 28, 2010, I caused a true

and correct copy of the attached to be served via ECF and a courtesy copy via electronic

mail of the following: (1) Amended Shareholder Class Action Complaint For Breaches

Of Fiduciary Duties And Individual Claims For Violation Of Sections 14(A) And 20(A)

Of The Securities Exchange Act Of 1934 And This Certificate Of Service upon the

parties listed below:

Tariq Mundiyz, Esq.
Antonia Yanez, Jr., Esq.
**WILLKIE FARR & GALLAGHER LLP**
787 Seventh Avenue
New York, N.Y. 10019-6099

*Attorneys for Defendant Millard Drexler*

Randall W. Bodner, Esq.
Peter L. Welsh, Esq.
Rodman K. Forter, Jr., Esq.
**ROPES & GRAY**
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600

*Attorneys for Defendants TPG
Capital, L.P. and James Coulter*

Sandra C. Goldstein, Esq.
Gary A. Bornstein, Esq.
**CRAVATH, SWAINE & MOORE**
Worldwide Plaza
825 Eighth Avenue
New York, N.Y. 10019-7475

*Attorneys for Defendants Josh Weston,
Mary Ann Casati, Stephen Squeri and David House*

James E. Brandt, Esq.
Sarah Lightdale, Esq.
**LATHAM & WATKINS LLP**
885 Third Avenue
New York, New York  10022

*Attorneys for Defendant Leonard Green & Partners, L.P.*

Meredith E. Kotler, Esq.
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
One Liberty Plaza
New York, NY 10006

*Attorneys for Defendants J. Crew Group, Inc.,
James Scully, Steven Grand-Jean, Stuart Sloan
and Heather Reisman*

JoAnn M. Sorrento